WALL et al. v. ANACONDA COPPER MINING CO. et al.

(District Court, D. Montana. July 31, 1914.)

No. 464.

1. CORPORATIONS (§§ 182, 189*)—ELECTION OF REMEDIES (§ 7*)—MINING CORPORATIONS—SALE OF ASSETS—DISSENTING STOCKHOLDERS—REMEDIES.

Rev. Codes Mont. §§ 4409–4412, provide that any Montana mining corporation, when directed by a vote of the holders of two-thirds of the outstanding stock authorizing a sale or accepting a proposition from any one to buy all the corporate property for cash, property, or capital stock of any other corporation, may sell or convey in accordance therewith as though all stockholders had consented thereto, and that thereupon the vendor is dissolved and any dissenting stockholder may proceed in court to secure an appraisal of the value of the stock and have judgment therefor, including expenses and costs, which shall be entered against both vendor and vendee and shall be a lien on all the real property sold. *Held* that, where a dissenting stockholder claims a fraudulent sale of the property of a mining corporation, he has a choice of remedies, to wit, appraisal or avoidance of the sale; but he cannot have both, and if he elects an appraisal he is estopped to sue.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 686–690, 706–722; Dec. Dig. §§ 182, 189;* Election of Remedies, Cent. Dig. § 12; Dec. Dig. § 7.*]

2. CORPORATIONS (§ 189*)—SELLING OF ASSETS—CONSOLIDATION—FRAUD—EVIDENCE.

In a suit by a minority stockholder to set aside an alleged sale of a mining corporation's assets to another company for alleged fraud, evidence *held* insufficient to establish either fraud or that the sale was effected without complainant's knowledge and consent.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 706–722; Dec. Dig. § 189.*]

In Equity. Suit by William E. Wall and another against the Anaconda Copper Mining Company and the Parrot Silver & Copper Company to avoid an executed sale of the property of the Parrot Company to the Anaconda Company. Decree for defendants.

Harrison Dunham, of Boston, Mass., R. L. Clinton, of Butte, Mont., and Asa P. French, of Boston, Mass., for complainants.

C. F. Kelley, L. O. Evans, and D'Gay Stivers, all of Butte, Mont., and W. B. Rodgers, of Anaconda, Mont., for defendants.

BOURQUIN, District Judge. This is a suit to avoid an executed sale of all the property of the defendant Parrot Company to the defendant Anaconda Company, both defendants Montana mining corporations.

Plaintiffs own 1,210 shares of 230,000 shares, 229,850 issued, the capital stock of the Parrot Company.

The complaint alleges that in 1899 A. C. Burrage, William Rockefeller, H. H. Rogers, and more than 15 named "other persons," purchased the majority of Parrot stock and at all times thereafter controlled the corporation pursuant to a conspiracy by them entered into to dissipate the company assets and to acquire them at less than real

value; the sale being the successful termination of the conspiracy. The methods thereto employed are detailed at great length. In substance, they are abandoning, closing, and dismantling the company's refinery and smelters, excess costs in mining, smelting and refining its products, unauthorized and concealed transfer of its personal and real property without consideration or for inadequate consideration and in part in trust for the "other persons" and to the Anaconda company and other corporations controlled by them, mismanagement of the Parrot company's mines so that mining was and is at a loss, concealment of company assets, duplicate, private, concealed, false, and fraudulent reports, accounts, and books, and denial to plaintiffs of access thereto, change of the company from a profitable to an unprofitable concern, infliction of losses upon it aggregating $100,000,000, and the sale involved at a valuation of $2,300,000, in consideration of 90,000 shares of Anaconda stock of the par value of $25, whereas the actual value of Parrot tangible assets was $100,000,000, and of its rights of action arising out of the acts aforesaid $100,000,000, or a total value of Parrot property so sold of $200,000,000. Plaintiffs also allege that they protested against the sale and thereafter proceeded in the proper state court of Montana to secure appraisal of their stock and payment of its value, but that therein they cannot secure appraisal of the company's rights of action arising from the conspiracy and so cannot secure the actual value of their stock. There are also allegations that the sale is obnoxious to the Sherman Anti-Trust Act, but this was abandoned at final hearing. The complaint does not directly allege that all or any of the wrongful acts aforesaid were not known to the stockholders either when they were committed or when the sale involved was by them directed.

The prayer is avoidance of the sale, a receiver to take an account between defendants, payment of any excess due from Anaconda to Parrot, and sale of all assets of Parrot with distribution of the proceeds to stockholders.

The answers are denials and explanations of specific transactions attacked in the complaint.

A great volume of testimony and other evidence has been submitted, entirely by deposition and master's report.

[1] It appears the sale involved was made in April, 1910, by virtue of statutes of Montana which in substance provide that any Montana mining corporation at any time so directed by the vote of holders of two-thirds of its outstanding stock authorizing a sale or accepting a proposition from any one to buy all the corporate property for cash, property, or capital stock of any other corporation, shall sell and convey in accordance therewith even as though all stockholders had consented thereto; and thereupon the vendor is dissolved and to be wound up as in other cases, that any dissenting stockholder may proceed in court to secure appraisal of the value of his stock and judgment therefor, including expenses and costs, shall be entered against both vendor and vendee, a lien upon all real property sold. Sections 4409-4412, R. C.

These statutes vest power, unknown at common law, in holders of two-thirds of the issued stock of any Montana mining corporation, for

any reason at any time to any one at any price for any consideration to sell all corporate property inclusive of choses in action and to dissolve the corporation. Motive, vendee, price, consideration are all immaterial, provided the transaction be free from fraud. Every stockholder consents thereto when he becomes a stockholder, and it is part of his contract with all other stockholders and the corporation. In a fair sale a dissenting stockholder has but the remedy of appraisal wherein he secures the value of his shares; that is, the value of his equitable interest in all corporate property inclusive of corporate choses of action arising from fraudulent management or otherwise.

In a fraudulent sale he has a choice of remedies—appraisal or avoidance of the sale. He cannot have both, and the choice of either estops to thereafter claim the other or at 'least a choice of appraisal with knowledge of all material facts is in its nature condonation of the fraud and acquiescence in the sale, and he cannot thereafter inconsistently maintain suit to avoid the sale. All this is of the general law of sales, as applicable to corporate sales by virtue of these statutes as to any sale. Defendants contend plaintiffs, having elected appraisal, are estopped from this suit.

The complaint sets out that plaintiffs proceeded to appraisal and does not allege lack of knowledge of acts and facts which might relieve them from their election. Having elected, prima facie they are estopped from the right and remedy of this suit, and the burden is on them to plead and prove otherwise. Regardless of the pleadings and burden of proof, consideration of the evidence discloses that when plaintiffs begun their appraisal action they had knowledge of all facts and fraudulent acts alleged in this suit, in so far as they are sustained by proof, to the extent any stockholder has or may have of corporate transactions openly accomplished.

It follows they so far acquiesced in the sale as to elect appraisal and so cannot recede therefrom and secure the inconsistent remedy of avoidance of the sale.

At the same time it is considered the court's findings on all issues should appear. In addition to the insufficiency of the complaint to excuse election, it is doubtful if the complaint can be maintained in any event. It is upon the theory of rescission or avoidance of a fraudulent sale, yet for all expressly alleged therein plaintiffs and all stockholders may have had at the time they directed the sale knowledge of all the acts alleged to constitute the fraud.

[2] If they had, their consent was free and the sale valid. If, however, it be assumed that from the allegations of control, secrecy, and concealments this lack of knowledge be inferred, the evidence fails to prove either fraud or lack of knowledge. When the sale was made, the Amalgamated Copper Company owned a majority of the stock of both Parrot and Anaconda. Burrage and some of the "other persons" had organized the Amalgamated and were interested in all three corporations, likely controlled them by majority ownership of shares and interlocking directorates. This is of less significance than ordinarily, in that, not the directors, but holders of two-thirds of Parrot shares, ordered the sale, and neither Amalgamated nor the "other persons" named

nor all united held the requisite two-thirds. If because thereof the sale should be more closely scrutinized, yet in view of the statutes aforesaid the burden to satisfy the court that it is fraudulent and voidable is upon plaintiffs who allege it. If unfair on its face, ambiguous, or suspicious, the burden of explanation may shift to those defending the sale's integrity. At the outset it is noted that, in so far as losses might accrue to Parrot from the acts complained of, the holders of the majority of Parrot stock would proportionately suffer. Their other interests would not relieve therefrom.

So far as the evidence goes, it is that in 1899 some few of the "other persons," including Burrage, Rockefeller, and Rogers, purchased a little more than half of Parrot stock. About two years thereafter this stock was sold to Amalgamated, and it thereafter controlled, as it lawfully might, Parrot operations. Therein, methods and instrumentalities changed. A refinery, an operating smelter, and an unfinished smelter were dismantled and sold. Some thereof, particularly salvage, were sold to Anaconda, but for fair prices.

The developed Parrot mine was of the earliest in the Butte, Mont., mining district. Its productive operations covered some 25 years. Several million dollars in dividends were paid. But several years before this sale its commercial ore bodies were practically exhausted, dividends ceased, operations were at a loss, and much exploration developed no new and valuable ore deposits. Complex geological conditions involved Parrot in "apex" controversies with neighbors, and these were settled in the main to Parrot's advantage. True and correct reports, accounts, and books were made and kept, accessible to all stockholders and inspected, experted and copied so far as desired by plaintiffs before this suit. At the time of this sale, Parrot was but a shadow of its former self. But its main mining property was well located, and it owned outlying mining property of no developed worth, so that taken as a whole it had probabilities and possibilities and was of actual and speculative value. All this and all acts of management were open and known at the time of occurrence and before and at the time of the sale. As an illustration the complaint alleges a loss to Parrot of $50,000,000, in that it was constrained to convey without consideration to another corporation in which the "other persons" were interested the "Blue vein" ore bodies to which Parrot's title had been finally determined by litigation, the truth being that there were "apex" controversies over the "Blue vein," said ore bodies were neither large nor of great value, there was no litigation, the adverse claims passed to a corporation in which Amalgamated had no interest though some of the "other persons" had, and a compromise was authorized by a meeting of Parrot stockholders in September, 1906, which compromise was effected and wherein Parrot received more than it yielded. The complaint is replete with allegations of fraudulent acts so variant from what the evidence shows to be true, from what plaintiffs knew to be true, or could have so known, that it appears reckless and in part to the point of willful falsehood.

To this another illustration is the allegation of conveyance of Parrot property in trust for the "other persons"; no such property ever having existed. All this appearing, any suit is discredited. It is argued

that since Parrot, while controlled by the "other persons," declined to unprofitableness, in large measure fraud is thereby proven. Not necessarily, or at all. Parrot, like all mines, lessened in value with every ton of ore extracted and came to the end of its visible resources. Its ore bodies were exhausted. Further development may revive it, but that is for the management's judgment to direct, and that development done disclosed no valuable ore bodies does not support the allegation and argument that the "other persons" have not discovered and so have concealed valuable ore bodies. Corporate management not ultra vires is of unlimited discretion, and free from fraud only stockholders and not courts can control it. But the court is admonished it must bear in mind that "the term Rockefeller" is a synonym for "secretiveness," "successful manipulation," "sly and subtle machinations," "sphinx-like mystery," only known by results. However that may be, however effective on the stump and curb, it is of no impressiveness in court.

Herein the fraud charged must be proven and by legal evidence, and not merely alleged in pleadings and for proof rested upon argument and oratorical endeavor. Finding no fraud in the sale, finding the stockholders' consent was free, it is unnecessary to inquire into the purchase price. That was determined by the holders of two-thirds of Parrot stock; Amalgamated holding a little more than half said stock. They satisfied, none can complain. They could direct a corporate sale for any consideration, even as they individually could make personal sales. Doubtless gross inadequacy might be a circumstance in a fraudulent sale. Aside from that, the dissenting stockholder has a plain, speedy, and adequate remedy at law in the appraisal proceedings provided by the statutes, wherein he secures the value of his shares though the others receive from the sale but a tithe thereof. It appears, however, that when this sale was made Anaconda stock had a market value ranging from $35 to $45 per share. Conditions were such that Parrot was not worth to itself or to any other independent concern the amount Anaconda in view of its resources and facilities could afford to and did pay.

The value of any mining property is a problem, and here it seems to have been solved fairly to Parrot. The purchase price was fair value and adequate, the sale was valid, plaintiffs elected the remedy of appraisal, they have no right, and there is no reason to rescind or avoid the sale, and decree accordingly will be entered.